## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

LEO PERRERO,

                              Plaintiff,

v.                                                          Case No. 6:16-CV-00112-GAP-TBS

HCL INC. and WALT DISNEY WORLD,

                              Defendants.

## PLAINTIFF, LEO PERRERO, RESPONSE TO WALT DISNEY WORLD PARKS AND RESORTS MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

Plaintiff, through undersigned counsel, respectfully responds to Defendant, Walt Disney World Parks and Resorts ("WDPR"), Motion to Dismiss and moves this court to deny such motion.

## Introduction

Defendants conspired to violate federal immigration law and, together, they did, in fact, violate federal law.  There was no required administrative remedy to exhaust prior to filing of Plaintiff's Complaint in contrary to Defendant's arguments in the Motion to Dismiss.  Plaintiff's Complaint meets even the most stringent of tests for pleading a plausible statement of claims. Defendant's arguments for dismissing the Complaint are insupportable, or, at best, are more suitable for a motion for summary judgment.

**Law and Arguments**

1. **Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 1949-50 (2009).  Iqbal states that a claim is plausible if the pleading permits the court to draw a reasonable inference that defendant is liable for the alleged misconduct.  Id.  Whether the allegations in the Complaint are plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. The Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Heldt v. Tata Consultancy Services, Ltd., 132 F. Supp. 3d 1185, 1189 (N.D. Cal. 2015) (internal citations omitted).  Plaintiff's Complaint meets the aforementioned requirements as asserted below.

2. **Racketeer Influenced and Corrupt Organization Act ("RICO")**

   a. **Racketeering and Pattern of Racketeering Were Properly Pled**

   i. **Fraudulent Attestation that Working Conditions Would Not Be Adversely Affected in Violation of 18 USC 1001, 1546 and 1621.**

Defendants together conspired to adversely affect the working conditions of similarly situated workers at WDPR with the H1B Sponsor falsely attesting that such would not occur in the Labor Condition Application.

Section (H) of the Labor Condition Application starts with an oversized exclamation point and starts "Important Note".  The employer must attest "(2) **Working Conditions:** Provide working conditions for nonimmigrants which will not adversely affect the working conditions of

workers similarly employed."  At the end of section (H) the employer must check yes that "I have read and agree to Labor Condition Statements 1, 2, 3, and 4 . . ."

20 CFR §655.732 prohibits sponsoring employers from adversely affecting the working conditions of the similarly situated workers.  Defendant argues that such prohibition only applies to the sponsoring employer's workers.  This is the reason there must be a conspiracy between the Defendants; an issue which is fully discussed below.

The CFR gives some examples of things that would affect working conditions, like seniority-based training programs and hours and shifts. Working conditions is not defined in the statute or the application.  A non-exclusive sample of working conditions are provided in 20 CFR Section 655.732 including, but not limited to, hours, shifts, vacation, training programs and work schedules.  Defendant failed to provide any authority that Plaintiff's working conditions could not have been adversely affected.[1]

To the contrary, Plaintiff's working conditions were vastly affected by the visa holders. Plaintiff had to train the visa holder every day.  His job duties were completely different after the visa holders were brought into WDPR.  Plaintiff was subject to a hostile work environment

---

[1] In the past this circuit's standard for both discrimination and retaliation claims has required an employee to establish an "ultimate employment decision" or make some other showing of substantiality in the employment context in order to establish an adverse employment action. *See Stavropoulos v. Firestone,* 361 F.3d 610, 616–17 (11th Cir.2004); *Gupta v. Florida Board of Regents,* 212 F.3d 571, 587 (11th Cir.2000); *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir.2001). We defined ultimate employment decisions as those "such as termination, failure to hire, or demotion." *Stavropoulos,* 361 F.3d at 617. And we required that conduct falling short of an ultimate employment decision must, in some substantial way, "alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [ ] his or her status as an employee." *Gupta,* 212 F.3d at 587 (quotation and citation omitted). More particularly, when defining the level of substantiality required for a Title VII discrimination claim, we required an employee to demonstrate she suffered "a *serious and material* change in *971 the terms, conditions, or privileges of employment" to show an adverse employment action. *Davis,* 245 F.3d at 1239 (emphasis added). The "serious and material change" requirement has also been applied in this circuit to Title VII retaliation claims.[10] *See, e.g., Stavropoulos,* 361 F.3d at 617; *Bass v. Board of County Com'rs, Orange County, Fla.,* 256 F.3d 1095, 1118 (11th Cir.2001); *Gupta,* 212 F.3d at 588; *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998); *Benefield v. Fulton Co., Ga.,* 130 Fed.Appx. 308 (11th Cir.2005).

where he was being fired but forced to train foreigners to do his job.  He also had to watch his co-workers do the same.  His entire working experienced altered completely by the visa holders.

Ultimately, Plaintiff was fired because of the visa holders.  Being fired is an adverse affect on Plaintiff's schedule, hours, training, vacation and all of the other examples provided in the Code of Federal Regulations.  It is an absurdity to argue that termination is not an adverse affect on working conditions.

In addition to Plaintiff, Defendants adversely affected the working conditions of several similarly situated workers and the H1B Sponsor attested against such in multiple Labor Condition Applications.

To be certain, this issue was well pled in the Complaint and the validity of the arguments in the Complaint are plausible.  Any argument regarding the issues raised by Defendant should be addressed in a motion for summary judgment or trial.  A motion to dismiss is not the proper legal avenue to flesh out such issues.

The pattern of racketeering with the racketeering activities were properly plead and there is plausibility of the veracity of the pleadings.  The court should deny the motion to dismiss.

### ii.  Unlawful Entry

Plaintiff alleges racketeering activity by and between WDPR and the H1B Sponsor under 18 U.S.C. §1961(1). Under §1961, any act that violates §1546 is indictable under §274 of the Immigration and Nationality Act and it constitutes racketeering activity if it was done with a profit motive. See Williams v. Mohawk Industries, Inc. 465 F.3d 1277 (11th Cir. 2006).[2] In this case, Plaintiff alleged that Defendants engaged in an ongoing pattern of violations §1546 and

---

[2] Mohawk was decided under a less rigorous pleading standard, but there is no standard where an offense indictable under the INA would not be considered "racketeering activity."

§274 of the Immigration and Nationality Act - for profit.[3] In particular, Plaintiff alleges that WDPR and the H1B Sponsor violated and continue to violate 8 U.S.C. §1324(a)(1)(A)(iv), which makes it a federal crime to "encourage[ ] or induce[ ] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that [entering or residing] is or will be in violation of law."

Aliens seeking to enter the U.S. to work are admissible only if the Secretary of Labor determines that there are not enough able, willing, qualified Americans to do the work, and employing the alien will not adversely affect the working conditions of similarly situated workers. See 8 U.S.C.A. §1182(5)(A).[4] If the Secretary of Labor determines that there are not enough able, willing, qualified Americans to do the work, and/or that employing the alien will not displace or adversely affect the working conditions or wages of similarly situated workers, then the alien may lawfully enter and remain in the United States. See §1182(5)(A). Contrariwise, if the Secretary of Labor, when provided true and honest information, determined

---

[3] See ¶¶ 11 and 12 for allegations related to the obligations and attestations related to exempt and non-exempt H1B personnel. One of the Defendants incorrectly states that plaintiff concedes that all H1B workers were exempt. Plaintiff concedes only that H1B sponsor claimed that they all exempt. The profit motive is addressed in ¶¶ 19 and 43. Paragraphs 19-21 and 23-24 address the scope of the association-in-fact by and between WDPR and the H1B sponsor

[4] (5) Labor certification and qualifications for certain immigrants
(A) Labor certification
(i) In general
Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that--
(I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and
(II) the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

that there are enough able, willing, qualified Americans to do the work, or that employing the alien will displace or adversely affect the working conditions or wages of similarly situated workers, then the alien may **not** lawfully enter or remain in the United States.

No alien seeking to enter the U.S. to work is permitted to do so without a sponsoring employer to attest that there are not enough able, willing, qualified Americans to do the work, and/or that employing the alien will not adversely affect the working conditions or wages of similarly situated workers. A false attestation is a crime by the sponsor, and it renders the alien's presence in the U.S. unlawful.  It renders the alien's presence unlawful because if the Secretary of Labor was provided true and honest information, the Secretary would determine that there are enough able, willing, qualified Americans to do the work, and/or that employing the alien will displace and/or there would be an adverse affect on the working conditions of similarly situated workers.  Hence, H1B workers brought in through a false attestation may not lawfully enter or remain in the United States and are therefore unlawful.

In this case, based on the true and correct information provided by the H1B Sponsor, which WDPR conspired to achieve, the working conditions of similarly situated workers were adversely affected and similarly situated workers were displaced.

18 U.S.C.A. §1546 states:

> **(b)** Whoever uses--
> **(3)** a false attestation,
> for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act, shall be fined under this title, imprisoned not more than 5 years, or both.

Plaintiff alleges unlawful entry and residence in the United States under 8 U.S.C. §1182(5)(A)(i)(I) because the H1B sponsor falsified the Labor Condition Application.  H1B Sponsor knew or recklessly disregarded that there were plenty of able, willing, qualified

Americans (*inter alia* Complaint ¶¶19 and 27) to do the required work and/or that the working

conditions of similarly situated workers would be adversely affected by complete change in

duties, training of replacements and helping transfer job duties to foreigners.  (This was

accomplished by the conspiracy of the two Defendants.)

 In violation of §1546, the sponsor falsely claimed that: (A) all of its non-immigrant[5]

sponsees were "exempt," when some were "non-exempt," and (B) admitting its non-immigrant

sponsees would have no adverse effect on similarly situated workers. *See* Verified Complaint, ¶¶

11 and 12 for allegations related to the obligations and attestations related to exempt and non-

exempt H1B personnel. (Note that one of the Defendants incorrectly stated that Plaintiff agreed

that the H1B workers were exempt.) In violation of §1182, the H1B workers adversely affected

the working conditions of similarly situated workers, and ultimately displaced the similarly

situated WDPR workers. *See* Verified Complaint ¶ 21.

 In addition to running outside the legal boundaries of 8 U.S.C. § 1546, these violations by

WDPR and the H1B sponsor are indictable under 8 U.S.C. §1324, which provides:

> (a) Criminal penalties
> (1)(A) Any person who--
> (iv) encourages or induces an alien to [enter or reside] in the United States,
> knowing or in reckless disregard of the fact that [entering or residing] is or will be
> in violation of law; or
> (v)(I) engages in any conspiracy to commit any of the preceding acts, or
> (II) aids or abets the commission of any of the preceding acts, shall
> be punished as provided in subparagraph (B).

 The Complaint alleges (¶ 58), that the H1B sponsor knew or was recklessly indifferent to

the fact that similarly situated qualified workers were already in the jobs at WDPR and they were

willing to remain in the jobs; it also alleges that the working conditions of the similarly situated

---

[5] "Nonimmigrants" are foreign nationals admitted to the United States for a temporary period of time and for a specific purpose, *like* visiting, studying, or working. *See* 8 U.S.C. § 1101(a)(15).

WDPR employees were adversely affected by placement of the H1B workers at WDPR and, ultimately, they were all displaced (fired).

### (iii) Required Knowledge / Reckless Indifference Factor

The Labor Condition Applications filed by the H1B Sponsor demonstrate that the H1B Sponsor and WDPR knew that its H1B workers were destined for WDPR. The H1B Sponsor, HCL America Inc., also posted notices prior to filing the Labor Condition Applications at WDPR as required by immigration law. Both demonstrating that HCL America Inc. and WDPR knew that H1B workers were being placed at WDPR, WDPR employees would have to train and completely alter their job conditions and WDPR employees would ultimately be terminated. Knowing that it was replacing hundreds of H1B workers at WDPR all at the same time, the H1B sponsor either knew or was recklessly indifferent to the fact that at least some of the existing WDPR employees were able, willing and qualified to continue working for WDPR. Both Defendants also knew or was recklessly indifferent to the fact that WDPR employees' working conditions would be adversely affected (something which could only be achieved in a conspiracy as set up by Defendants.)

"[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing. *See* Glob.-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769-70, 131 S. Ct. 2060, 2070-71 (2011); *c.f.* Mendoza-Rodriguez v. U.S. Atty. Gen., 405 Fed. Appx. 359, 363 (11th Cir. 2010) (acquiescence is a species of willful blindness).

Williams v. Mohawk Industries, Inc. 465 F.3d 1277 (11th Cir. 2006), provides a template for analyzing motions to dismiss in RICO cases against corporations who work together to recruit and employ foreign workers under unlawful circumstances. The Williams court wrote:

> According to 18 U.S.C. § 1961(1)(F), "'racketeering activity' means any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), ... if the act indictable under such section of such Act was committed for the purpose of financial gain." In this case, the plaintiffs have alleged that the defendant has engaged in an open and ongoing pattern of violations of section 274 of the Immigration and Nationality Act. In particular, plaintiffs allege that Mohawk has violated and continues to violate: (1) 8 U.S.C. § 1324(a)(3)(A), which makes it a federal crime to "knowingly hire [ ] for employment at least 10 individuals with actual knowledge that the individuals are aliens" during a twelve-month period; (2) 8 U.S.C. § 1324(a)(1)(A)(iii), which makes it a federal crime to "conceal[ ], harbor[ ], or shield from detection, or attempt [ ] to conceal, harbor or shield from detection" aliens that have illegally entered the United States; and (3) 8 U.S.C. § 1324(a)(1)(A)(iv), which makes it a federal crime to "encourage[ ] or induce[ ] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." According to the plaintiffs' complaint, Mohawk has committed hundreds, even thousands, of violations of federal immigration laws. Consequently, we conclude that the plaintiffs have properly alleged a "pattern of racketeering activity."[3] FN 3: There is no dispute that these predicate acts, if they occurred, are related. *See Pelletier v. Zweifel,* 921 F.2d 1465, 1496-97 (11th Cir.1991) ("Predicate acts are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events." (internal quotation marks and citation omitted)). Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1283 (11th Cir. 2006).

## b.  Association in fact – Enterprise

In Boyle v. United States, 556 U.S. 938, 129 S.Ct. 2237 (2009) the Supreme Court stated that the concept of an "association in fact" is expansive. Id.  The Boyle Court noted that RICO terms are to be "liberally construed to effectuate its remedial purposes." Id., *citing* National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 257, 114 S.Ct. 798 (1994) ("RICO

broadly defines 'enterprise'"); <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 497, 105 S.Ct. 3275 (1985) ("RICO is to be read broadly").

**(i)     The Enterprise is Separate and Apart From the Racketeering Activity**

Regarding whether the association-in-fact enterprise of the H1B Sponsor and WDPR is "separate and apart" from the pattern of racketeering, the Supreme Court in <u>Boyle</u> explained that "an enterprise includes any union or group of individuals associated in fact" and that RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." <u>Id.</u>, at 945, citing to <u>United States v. Turkette</u>, 452 U.S. 576, 580, 583, 101 S.Ct. 2524 (1981). Moreover, in <u>Boyle</u>, the Supreme Court identified those three structural features as indispensable to an association-in-fact enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." <u>Boyle</u>, 556 U.S. at 946, 129 S.Ct. 2237.

Courts in this Circuit and elsewhere have held that the allegation of an enterprise's organizational structure and roles is sufficient to find that the enterprise is an entity "separate and apart" from the pattern.  <u>Montoya v. PNC Bank</u>, 94 F. Supp.3d 1293, 1314 (S.D. Fla. 2015) (an enterprise consisting of three corporations contained an "organizational system with multiple players" and defined roles and thus was "separate and apart" from the pattern of racketeering). <u>See also In re Managed Care Litigation</u>, 298 F.Supp.2d 1259, 1274 (S.D. Fla., 2003) (holding the SAC defined a sufficiently discrete enterprise organization which was thus "separate and apart" from the racketeering activity for purposes of RICO liability).

The Complaint alleges (¶¶ 5-6, 17-21 and 40) that the H1B Sponsor and WDPR are separate companies, that Defendants have an agreement to import foreign labor, which is cheaper than similarly situated workers that are in place, to adversely affect the working conditions of similarly situated workers, and ultimately to displace similarly situated workers—something neither could do on its own. The association-in-fact enterprise of the H1B sponsor and WDPR existed "separate and apart" from their separate affairs and the racketeering activity.    See Complaint, ¶ 40, in which it is plausibly alleged that each enterprise entities had a purpose; there were distinct roles between the H1B sponsor and WDPR associated with the enterprise, and there was longevity.  See also ¶¶ 42-43, describing the roles of the H1B sponsor and WDPR in the arrangement.  Therefore, it is adequately alleged that the H1B sponsor/WDPR enterprise is "separate and apart" from the racketeering activity.

Again, it is important to note that immigration law provides, and Defendants do not argue against, that the prohibition against adversely affecting similarly situated workers is limited to the sponsoring employer.  In order for WDPR to accomplish the financial benefit of the cheaper foreign labor and profit from H1B workers (instead of the employed Americans whom were fired), WDPR could not, itself, have sponsored the H1B workers at their facility because the H1B workers clearly adversely affected its own workers (see above for manner in which WDPR workers were adversely affected).

Likewise, Cognizant could not assist WDPR in the pursuit of profit of cheaper foreign labor over American workers without providing WDPR with H1B workers.  That was an integral part of their enterprise and business relationship.  Accordingly, Cognizant attests in the Labor Condition Application that its similarly situated workers will not be adversely affected, but, at the same time, conspires with WDPR to adversely affect WDPR's similarly situated workers.

This is a violation of the immigration law together, as an enterprise, which could not have been done individually.

> **(ii)      "Common Purpose" Between the H1B Sponsor and Disney**

Courts have liberally construed the "common purpose" part of the enterprise requirement. Allstate Ins. Co., v. Plambeck, DC, 802 F.3d 665, 674 (5th Cir. 2015) (holding that an association can satisfy the enterprise requirement under RICO even if its sole purpose is to carry out a pattern of racketeering).  Accord Ouwinga v. Benistar 419 Plan Services, Inc., 694 F.3d 783, 994-795 (6th Cir. 2012).  See also Marrero-Rolon v. Autoridad De Energia Electrica, P.R.,  2015 WL 579801, *11 (D.P.R., Sept. 29, 2015) (denying motion to dismiss, the fact that some of the defendants groups of defendants might have *also* had other objectives was not problematic).

The Complaint alleges (¶ 41), an "economic interdependence" between the H1B Sponsor and WDPR.   These companies were not just advancing their own interests, but each involved itself in the affairs of the other (¶ 42), and created an arrangement for their mutual benefit (¶ 43). One such "common purpose" is to falsely attest that the working conditions of the similarly situated workers would not be adversely affected for the financial mutual benefit of the association in fact.  (¶¶ 17-19)

The "common interest" of the H1B Sponsor and WDPR was to obtain profit by using H1B workers unlawfully in the United States through the combined efforts of the H1B Sponsor and WDPR, neither of which could have profited without the other.

The Defendant's citation to Ray v. Spirit Airlines, 126 F. Supp.3d 1332, 1340-1341 (S.D. Fla. 2015), is understandable, but Ray involved a different fact scenario, an "enterprise" comprised only of contractors and consultants of one corporation.   Ray did not involve "distinct entities" as discussed in Williams, below, and addressed a specific legal issue not in dispute here,

that is, whether the enterprise consisting of the corporation and its consultants and contractors was *distinct* from the RICO defendant person Spirit Airlines.   The court in <u>Spirit Airlines</u>, <u>supra</u>, 126 F.Supp. 3d at 1340-1341 cited cases, including <u>Burstein</u>, in which courts have found RICO enterprises comprised only of the company's employees, counsel, consultants, and agents, as not distinct from the RICO corporate defendant "persons."   <u>See also</u> <u>Riverwoods Chappaqua Corp.,</u> <u>v. Marine Midland Bank</u>, 30 F.3d 339 (2d Cir. 1994) (finding insufficient distinctness between a corporate defendant and an enterprise consisting of the corporation, its subsidiaries and employees).

This Complaint does not involve defendant person corporations and a proposed enterprise consisting of the defendant corporation and related subsidiaries and affiliates.  Instead, it is alleged that two different corporations (the H1B sponsor and Disney) banded together as a continuing unit with a common purpose of seeking a mutual illegal economic benefit, *i.e*., the hiring and employing of low-cost H1B workers by falsely attesting that the working conditions of similarly situated workers would not be adversely affected which could only be accomplished with Defendants' enterprise and racketeering activity.

As alleged in the (Complaint, para. 41), without the H1B Sponsor acting as the employer and WDPR collaborating as the lessee of the H1B Sponsor employees, the H1B Sponsor's "business model" would not be viable and the end result of adversely affecting the working conditions of similarly situated workers would be accomplished.  The H1B Sponsor was dependent on contracting with the willing recipient company: WDPR.   Moreover, as alleged in the Complaint, the "economic interdependence" allowed WDPR to hire large numbers of H1B visa holders with the resulting displacement of U.S. workers.

(iii)    **Williams v. Mohawk Industries**

Although the Defendant goes to great length to distinguish Williams v Mohawk

Industries, 465 F.3d 1277, 284-1285 (11th Cir. 2006), that case is an excellent example of this

Circuit finding a valid enterprise whose constituents had a "common purpose."   In Williams,

supra, the court upheld a RICO enterprise in a civil RICO action which consisted of Mohawk

and third-party temp agencies/recruiters which, similar to here, conspired to violate federal

immigration laws.  The court in Williams held that the plaintiffs' complaint sufficiently alleged

an "enterprise" under RICO; that is an association in fact between Mohawk and third-party

recruiters, "*distinct entities*" which were alleged to have engaged in a conspiracy to bring illegal

workers into this country for Mohawk's benefit.  Id., at 1284 (emphasis added).

The court specifically addressed "common purpose," *i.e*., that "[t]he recruiters and

Mohawk share the common purpose of obtaining illegal workers for employment by Mohawk."

Similar to the instant Complaint, it was alleged in Williams, supra, that each member of the

enterprise allegedly reaped a large economic benefit from Mohawk's employment of illegal

workers.  Id., at 1284, citing to United States v. Church, 955 F.2d 688, 698 (11th Cir.1992), in

which the Circuit had concluded that the "common purpose" of making money was sufficient

under RICO.   Thus, because the complaint in Williams clearly alleged that the members of the

enterprise stand to gain sufficient financial benefits from Mohawk's widespread employment and

harboring of illegal workers, the plaintiffs there properly alleged a "common purpose" for the

purposes of RICO.  Id., at 1284-1285.  See also Montoya v. PNC Bank, supra, 94 F.Supp.3d at

1314, finding that an enterprise of three corporations functioning together were bound by a

"common purpose" when it was alleged that PNC and ASIC forged an exclusive relationship of

artificially inflating force-placed charges.

Accordingly, as found in this Circuit, and others, a valid RICO enterprise is adequately alleged and the common purpose requirement satisfied when constituent entities in the enterprise, the H1B sponsor and Disney, functioned together, and established an economic interdependence in order to reap mutual illegal economic benefit and gain by falsifying federal documents.  Complaint, para. 41-43.

### c.   Conspiracy

Defendant argues that the RICO conspiracy claim would automatically fail if the section 1962(c) claim is dismissed.   Even if *arguendo* the substantive claim was dismissed, which it should not be, the law is clear that conspiracy liability under section 1962(d) may remain.  The Defendant fails to cite to the Supreme Court decision in Salinas v. United States, 522 U.S. 52, 61-66, 118 S.Ct. 469 (1997) which held that to secure a conviction for RICO conspiracy, the government is not required to allege or prove the actual completion of a single racketeering act by the defendant or any other member of the conspiracy.  Moreover, the Supreme Court in Salinas specifically held that there is no requirement that the defendant "himself committed or agreed to commit the two predicate acts requisite for a substantive offense under section 1962(c)."  Id., at 61.

Circuits and district courts have followed Salinas and ruled in civil RICO litigation that liability for a substantive RICO violation is not a prerequisite to liability under RICO's conspiracy provision and that Salinas did not only apply to a criminal RICO action but also to civil RICO claims.  See Smith v. Berg, 247 F.3d 532, (3rd Cir. 2001); See also Marrero-Rolon, supra, 2015 WL 5719801, at *18 (same).

Thus, Defendant is incorrect as a matter of law that a RICO conspiracy claim fails as a matter of law if the substantive claim fails.   In this case, even if one of the Defendants,

*arguendo*, did not commit multiple racketeering acts, the Complaint adequately alleges that each Defendant agreed to the conspiratorial objective (Complaint, para. 67), and adequately alleges that each Defendant agreed that a conspirator would commit multiple acts of racketeering in the course of participating in the affairs of the enterprise.  (Complaint, para. 68).  This is in and of itself sufficient to allege that the Defendant violated section 1962(d).

### d.  Plausibility of the Argument

Defendant argues that Plaintiff's allegations in his Complaint are not plausible as required by case law.  Plaintiff's allegations in his Complaint are plausible, true and are an actual violation of the claims brought.  Please see Complaint and above arguments in response to the motion to dismiss.

### 3.  Administrative Remedies

There is no administrative remedy or administrative requirement in connection with RICO. There are two primary Eleventh Circuit RICO cases involving unlawful foreign labor: Williams v. Mohawk Industries, 465 F.3d 1277 (11th Cir. 2006), and Simpson v. Sanderson Farms, Inc., 744 F.3d 702 (11th Cir. 2014).

There was no mention of any administrative remedy in any of the Mohawk cases: Williams v. Mohawk Indus., Inc., 314 F. Supp. 2d 1333 (N.D. Ga. 2004), Mohawk I, 411 F.3d 1252 (11th Cir. 2005), Mohawk Indus., Inc. v. Williams, 547 U.S. 516, 516-17 (2006)("remanded to the United States Court of Appeals for the Eleventh Circuit for further consideration in light of *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451 (2006)"), Mokawk II, 465 F.3d 1277 (11th Cir. 2006).

There was no mention of any administrative remedy by the District Court in Simpson, 2013 WL 443620 (M.D. Ga. 2013) (Plaintiffs conclude without specificity that presence of

unauthorized workers causes wage depression; case dismissed). The Eleventh Circuit's <u>Simpson</u>

opinion, 744 F.3d 702 (11th Cir. 2014) does not mention resort to any administrative remedy or

process. It says, "The Court agrees with Defendants that actual data is required to support the

wage depression claim."[6]

Defendant cites 8 U.S.C. Section 1182(n) as support for the notion that plaintiff "shall"

file all claims with the Secretary before going to District Court. But 8 U.S.C. 1182(n)(G)(2)(A)

states that "[c]omplaints **may** be filed by any aggrieved person or organization," not "shall."

(emphasis added). There is nothing in 8 U.S.C. 1182 to support going through the Secretary

before filing a RICO suit, perhaps why Defendant cites no RICO with an administrative agency

connection.

Defendant cites 20 C.F.R. 650 *et al* as part of the argument that filing a complaint with

the Secretary is a prerequisite to filing a complaint in federal district court.  Section 650 is very

---

[6] *Simpson* at the District level said that *Mohawk* had no precedential value because of a more rigorous pleading standard. The 11th Circuit's *Simpson* opinion did not examine whether the *Mohawk* construct was dead and buried because there was no pleading standard that would have made Ms. Simpson's Complaint viable. She alleged that she got a raise but that it should and would have been more but for unlawful foreign labor. She did not allege for instance, that the prevailing wage in her industry and location was X, but her actual wage was Y, and Y was less than X. Ms. Simpson lost because of insufficient specificity. Please consider whether the conclusion in *Simpson* would have been different if that case had pleaded the facts of this case: corporations worked together, imported alien labor and, instead of depressing wages, fired hundreds of willing and qualified U.S. workers. The *Simpson* construct is valid, but it requires the opposite result for the same reason. There was no version of law or logic that would have made Ms. Simpson's Complaint sufficient; she did not offer any facts that anybody could believe to support her conclusion that her wages had been depressed. Here, alien labor came in and all willing and qualified similarly-situated workers were fired. There is no version of law or logic where going from some wages to zero wages (when fired) would not count as depressed wages. There is no version of law or logic where going from having a job to not having a job is not adverse. *Simpson* was a "ragged-edge" set of facts that required greater specificity. This is a "ragged-edge" set of facts in which greater specificity in not possible. Everybody who was willing and qualified was fired.

specific in the steps for filing and proceeding through the administrative process, but there are no regulations on filing suit in district court in 20 C.F.R. 650 *et al*.   There is no statutory language that a claim brought pursuant to 29 C.F.R. 650 *et al* is a requisite to filing a lawsuit in federal district court.

Contrariwise, 29 C.F.R. 1601.28(e)(1) specifically states that after the Equal Employment Opportunity Commission ("EEOC") concludes its investigation, a Right to Sue letter is issued so that the complainant may file suit.  This illustrates how Congress makes the right to sue conditional on administrative agency action. The Title VII statutes provide for the right to file suit 90 days after receiving the EEOC's decision.  See 42 U.S.C. 2000. This further demonstrates the manner in which Congress makes the right to sue conditional on administrative agency action.

There are myriad cases stating that EEOC action is a prerequisite to filing a lawsuit. *See*, e.g., Tillery v. USDHS, 402 Fed.Appx 421 (11th Cir. 2010); US. v. City of Chicago Ill, 560 U.S. 205, 130 S.Ct. 2191 (2010); Alexander v. Hawk, 159 F.3d 1321 (11th Cir. 1998).

Defendant cited some cases asserting that filing with the Secretary is a prerequisite to filing a complaint in federal district court in some situations.  However, this situation is not one of those particular situations.

Plaintiff was not required to file with the Secretary based on the allegations asserted in Plaintiff's Complaint, conspiracy to falsify the Labor Certification Application.  The cases Defendant cites do not include conspiracy or anything beyond simple violations of the Labor Certification Application or the statutory requirements regarding the visa holder.  There is no language in the statute that provides the Secretary with the authority to investigate a claim of conspiracy in violation of Section 1182.  Defendant failed to provide even one example in which

a claim of fraud, conspiracy, or RICO was brought before the Secretary. The Secretary lacks the authority to investigate such claims. Under the present circumstances, there is no administrative remedy to exhaust.

### 4. Florida Civil Conspiracy Claim

Defendant argues there is no state conspiracy claim because there is no substantive RICO violation established and the arguments are premised on misunderstanding of immigration law. Plaintiff reasserts the aforementioned law and arguments. Plaintiff properly pled the Florida Civil Conspiracy Claim and it should not be dismissed.

### 5. Leave to Amend

A motion to amend a Complaint is "committed to the sound discretion of the district court," but that discretion "is strictly circumscribed" by Rule 15(a)(2) of the Federal Rules of Civil Procedure, which instructs that leave to amend should be "freely give[n] when justice so requires." *Gramegna v. Johnson,* 846 F.2d 675, 678 (11th Cir.1988); *see also Shipner v. E. Air Lines, Inc.,* 868 F.2d 401, 407 (11th Cir.1989) ( "[U]nless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial"). *See* City of Miami v. Bank of Am. Corp., 800 F.3d 1262, 1286 (11th Cir. 2015), cert. granted sub nom. Bank of Am. Corp. v. City of Miami, Fla., 84 USLW 3509, 2016 WL 853246 (June 28, 2016).

### Conclusion

Based on the aforementioned argument and Plaintiff's Complaint, Plaintiff prays this court denies Defendant's Motion to Dismiss permitting Plaintiff to prove his case through the litigation process.

Submitted this <u>11th</u> day of July, 2016.

Respectfully submitted,

*Sara Blackwell*

Sara Blackwell (Bar No. 090443)
The Blackwell Firm
1800 2nd St. Ste. 882
Sarasota, FL 34236
Telephone: 941-961-3046
Facsimile: 1-888-802-9466
E-mail: sara@theblackwellfirm.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, Sara Blackwell, hereby certify that I have this 11th day of July, 2016, served the foregoing by email upon the following attorneys of record:

Richard S. Dellinger, Esquire
Florida Bar No.: 179957
  LOWNDES, DROSDICK, DOSTER,
  KANTOR &  REED, P.A.
215 North Eola Drive
Orlando, Florida 32801
Telephone: (407) 843-4600
Facsimile (407) 843-4444
  E-mail:richard.dellinger@lowndes-law.com

Charles B. Casper, Esquire (admitted *pro hac vice*)
Pennsylvania Bar No.: 42784
MONTGOMERY, McCRACKEN, WALKER &
  RHOADS, LLP
123 South Broad Street
Philadelphia, Pennsylvania  19109
Telephone:  (215) 772-1500
Facsimile: (215) 772-7620
E-mail:ccasper@mmwr.com

Mary Ruth Houston, Esquire
Glennys Ortega Rubin, Esquire
SHUTTS & BOWEN LLP
300 South Orange Avenue, Suite 1000
Orlando, FL 32801
E-mail:  mhouston@shutts.com
E-mail:  grubin@shutts.com

David W. Ogden, Esquire (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
E-mail:  David.ogden@wilmerhale.com

Alan Schoenfeld, Esquire (admitted *pro hac vice*)
Colin Reardon, Esquire (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
7 World Trade Center, 250 Greenwich Street
New York, NY 10007
E-mail: Alan.Schoenfeld@wilmerhale.com
E-mail: Colin.reardon@wilmerhale.com